IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| FREDRIA LESAY THOMAS )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN COLVIN, Commissioner )<br>Of Social Security[1], )<br>)<br>    Defendant. ) | CIVIL ACTION NO. 12-227-N |

ORDER

This action is plaintiff's appeal from the final decision of the Commissioner denying her claim for Supplemental Security Income ("SSI") benefits. The parties have waived oral argument (docs. 16, 19) and consented to the exercise of jurisdiction by a Magistrate Judge (doc.17). The action has been referred to the undersigned for all purposes (doc. 18). Upon review of the record, including the briefs of the parties (docs. 13, 14), it is the finding of this court that the action is due to be REMANDED to the Commissioner for further proceedings consistent with this opinion.

Procedural Background

Plaintiff filed her application for disability insurance benefits on June 26, 2008, alleging that she became disabled as of November 1, 2007, when she was 22 years of age. Her claim was denied at the initial stage, and she sought and was granted a hearing before an Administrative Law Judge ("ALJ") which was held on February 10, 2010. Plaintiff

---

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin is substituted for Michael J. Astrue as Defendant in this action. No further action needs to be taken as a result of this substitution. 42 U.S.C. § 405(g).

was represented by Attorney Forrest Jackson at the hearing, and is represented in this appeal by Attorney Quinn E. Brock.  The ALJ issued an unfavorable decision on April 20, 2010.  Plaintiff sought review from the Appeals Council, which denied review on February 1, 2012.  Nonetheless, the Appeals Council noted that the ALJ's finding at step 4 was inadequate, because plaintiff's past work was not performed at the level of "substantial gainful activity," but nonetheless relied on the vocational testimony adduced at the hearing to find that plaintiff could perform other work.  The instant appeal from the final decision of the Commissioner timely followed.

*Legal Standard*

Scope of Judicial Review

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  Washington v. Astrue, 558 F.Supp.2d 1287, 1296 (N.D.Ga. 2008); Fields v. Harris, 498 F.Supp. 478, 488 (N.D.Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. Lewis v. Callahan, 125 F.3d 1436, 1439-40 (11th Cir. 1997); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Hillsman v. Bowen, 804 F.2d 1179, 1180 (11th Cir. 1986); Bloodsworth v. Heckler, 703 F.2d 1233,

1239 (11th Cir. 1983). "Substantial evidence" means more than a scintilla, but less than a preponderance.  In other words, "substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  Richardson v. Perales, 402 U.S. 389 (1971); Hillsman, 804 F.2d at 1180; Bloodsworth, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  Foote v. Chater, 67 F.3d 1553, 1558 (11th Cir. 1995); Walker, 826 F.2d at 999.

Statutory and Regulatory Framework

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are

identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. Patterson v. Bowen, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. See 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. See 20 C.F.R. §§ 404.1520, 416.920 (2010).

> (1) Is the person presently unemployed?
>
> (2) Is the person's impairment(s) severe?
>
> (3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[2]
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[2] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. Id.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). Id. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. Id. It also can contain both exertional and nonexertional limitations. Id. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. Id. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). Id. at 1239–40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. Id. at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." Id.

Issues Presented

Plaintiff does not challenge the Commissioner's determinations concerning her seizures or mental health impairments; her appeal focuses on the handling of her physical impairments.  Plaintiff raises the following issues in this appeal:

1. The ALJ erred in failing to fully and fairly develop the record:

    a. by failing to order a consultative physical evaluation (including at least an x-ray of plaintiff's spine);

    b. by making an RFC determination in the absence of any medical RFC assessment in the administrative record.

2. The ALJ erred in evaluating plaintiff's impairments:

    a. by failing to evaluate the combined effects of all impairments, both severe and nonsevere;

    b. by failing to properly evaluate plaintiff's subjective complaints of non-exertional impairments;

    c. by deciding, without medical evidence, that "no evidence supporting [certain] injuries would impose significant limitations"; and

    d. by discrediting plaintiff's testimony on the basis of lack of treatment despite evidence and a finding that poverty limitations in treatment, without questioning plaintiff on the reason for such failure and the availability of low-cost or free care for all of her complaints.

3. The Appeals Council's decision that there were jobs in the national economy which plaintiff could perform was based on an incomplete or inapplicable hypothetical question to the vocational expert at the hearing.

Facts and Administrative Holdings

*Commissioner's Determinations*

At step one of the sequential evaluation, the ALJ found that plaintiff had not engaged in substantial gainful activity since the date she applied for benefits, June, 26, 2008.

At step two, the ALJ found that plaintiff had the following severe impairments: seizure disorder, depression and personality disorder.  The ALJ also found she suffered from the following conditions which were not severe: hypothyroidism[3]; hypertension[4]; obesity[5]; headaches[6]; asthma[7]; and back pain from scoliosis as well as hip and knee pain secondary to a car wreck in 2001[8].

---

[3] The ALJ held that, with medication, this condition caused minimal residual symptoms.

[4] The ALJ found that this condition was 'attenuated' by treatment, and thus did not constitute a severe impairment.

[5] The ALJ held that medical records demonstrated a body mass index of a level and duration sufficient to trigger consideration under SSR 02-1p, but upon such consideration, found that there was no objective medical evidence of any substantial functional restrictions resulting from her weight.

[6] The ALJ found that mention of such headaches in medical records was irregular and the diagnosis inconsistent.  Plaintiff's only medical treatment for headaches was a single prescription dose of Tylenol.  In light of the inconsistent evidence of the condition, the minimal treatment prescribed, and the lack of evidence that the headaches cause any significant limitation, the ALJ determined that the headaches were not a severe impairment.

[7] The ALJ held that plaintiff's asthma was controlled with medication and that the condition was thus not severe.

[8] The ALJ held that plaintiff's proof of these underlying medical conditions was lacking, and thus that there was inadequate objective support for plaintiff's subjective claims of pain under the Social Security pain standard (SSR 96-7p).  The ALJ summarized that standard, stating that "[a]n individual's symptoms such as pain, numbness, loss of extremity control, and shaking, will not be found to affect the individual's ability to do work activities unless medical signs and laboratory findings show that there is a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms alleged."  Doc. 12 at 21.

The ALJ further determined, at the third step of the sequential evaluation, that none of plaintiff's impairments or combination of impairments meets or medically equals one of the 'listings' (20 C.F.R. §§416.920(d), 416.925 and 416.926). The ALJ applied the 'paragraph B' criteria for mental impairments, finding that plaintiff had not exhibited marked difficulties in daily living, social functioning, maintaining concentration, persistence and pace, or repeated episodes of decompensation. The ALJ also found that plaintiff's mental condition did not satisfy the 'paragraph C' criteria, as there was no evidence of repeated decompensation, a residual disease process, or history of inability to function.

The fourth step of the sequential evaluation requires the ALJ to determine whether the claimant can perform her past relevant work. The Appeals Council held that the ALJ had erred in determining that plaintiff had any past relevant work[9], as she had not performed any job at the level of substantial gainful employment. Doc. 12 at 4. The Appeals Council nonetheless determined, at step five, based on the VE's testimony, that plaintiff could perform work as an assembler or microfilm document preparer.

The ALJ determined plaintiff's residual functional capacity ("RFC") to include:

> a full range of work at all exertional levels but with the following non-exertional limitations: frequently climb ramps and stairs, balance, stoop, kneel, or crawl; never climb ladders, ropes or scaffolds and avoid all exposure to work hazards; claimant can remember and carry out short, simple instructions, and attend for two hour periods; frequent contact with the general public should not be a routine requirement of the claimant's work and changes in the work setting should be minimal.

---

[9] The ALJ stated that plaintiff's prior jobs as a fast food worker and as a security guard constituted "past relevant work" and that plaintiff's limitations did not preclude her from performing work as a security guard. Doc. 12 at 27-28. The Appeals Council determined that plaintiff had not performed either job long enough to meet the requirements of past relevant work.

Doc. 12 at 24. In reaching this RFC, the ALJ rejected all plaintiff's complaints of pain; as noted above, the ALJ did so on the basis that the medical records plaintiff submitted did not include any showing that plaintiff suffered from scoliosis or any other underlying medical condition which could produce such pain, and thus that plaintiff failed to satisfy the first step of the pain standard.[10]

*Plaintiff's Testimony*[11]

At the hearing before the ALJ, the plaintiff testified concerning her medical condition, treatment, activities and other matters. She stated that she was prescribed several medications over the years for her seizures, including Tegratol, Depakote, and most recently, Keppra, but that her seizures had never been fully controlled. On the current medication, plaintiff reported that she suffered seizures once a week that lasted for 15-20 minutes; prior to a recent increase in her medication, she stated that she had seizures at least twice a week that lasted for 30 minutes to an hour.

Plaintiff also testified that she had been treated for mental health conditions in 2008 following a suicide attempt.

Plaintiff stated that the seizures were her worst problem, followed by back pain and asthma. She described her resulting pain as being in her neck and shoulders, either as a sharp pain when it was cold or raining, or as causing her muscles to stiffen. The pain began after her car accident in 2001. Plaintiff testified that she had been diagnosed as

---

[10] The pain standard requires evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged pain or (2) an objective determination that the medical condition could reasonably be expected to give rise to the alleged pain. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).
[11] Doc. 12 at 29-53.

9

having scoliosis by one doctor, though his diagnosis was made after running a finger along her spine.  No x-rays were included or mentioned in the medical records.

Plaintiff testified that her asthma caused her to become easily short of breath, as when she would take a bath, and also that she would choke in her sleep.  During her waking hours, she stated that she would use her inhaler at least five times per day.  Her breathing was worse when she got too hot.

Plaintiff testified concerning pain in her hips and knees, which started at about the time of her car accident.  She would have this kind of pain approximately once per week.  She also testified to having headaches once or twice per week, and that they would last all day long.  She had never been prescribed medication for the headaches, and had not been diagnosed with any condition which would cause them.  Though she thought they might be due to her eyesight, her glasses did not seem to help that condition.  She took over-the-counter medication for the headaches, such as ibuprofen.

Plaintiff also testified that her medications for seizure and blood pressure made her sleepy; she stated that she spent most of each day asleep.  With regard to her current seizure medication, Keppra, she stated that she would become drowsy and fall asleep approximately 15 minutes after taking it.  She testified that she would wake up between 10 a.m. and 1 p.m., take another nap from 3 or 4 p.m. to 7 p.m. and go to bed for the night at approximately 9 p.m.   When awake, she stated that she would help keep the living room and bathroom clean, and would dress and bathe herself, prepare her own food, and watch television while lying in her bed.

*Medical Records*

The record contains medical records, some of which are from as far back as 1992, including:

Medical records from USA department of Neurology, from 4/20/92 through 1/30/95. A letter from Dr. Paul Martens dated February 9, 1994, sets forth some earlier history of neurological problems such as transient right hemiplegia in 1988, paroxysmal bilateral lower extremity weakness at age five, for which tests showed Dysrhythmia Grade III left posterior hemisphere, as well as upper extremity weakness on both sides but worse on the right side, and was prescribed Tegretol, and continued to take it through the date of the note. It was also noted that plaintiff had a seizure in June 1992 and complained of headaches, as well.[12]

A report from USA Knollwood Park, dated 5/18/2000, relating to testing, including an EEG, as a result of seizures. No significant abnormality was shown.

A record from Franklin Primary Health dated June 16, 2008; plaintiff's complaint was identified as headache and "need help filling my prescriptions; no income." Plaintiff was taking Depakote 250 mg; synthroid, and norvase 5 mg.

A record from USA Medical Center dated July 7, 2008, following her suicide attempt. On examination, she was diagnosed with adjustment disorder with depressed mood; after her admission, the diagnosis was altered to mood disorder, non-specific and borderline personality disorder.

A psychological consultative examination of plaintiff was conducted by John W. Davis, Ph.D. on October 23, 2008. Dr. Davis diagnosed personality disorder, cluster B,

---

[12] Though not entirely clear from the note, either plaintiff or her mother had allergies and a history of black-out episodes. As of 1993, plaintiff was noted to have frequent headaches and behavioral problems.

and a general mood of depression.  He provided the opinion that plaintiff could do simple, routine repetitive tasks and could get along with others.

A non-examining state psychologist gave an assessment of plaintiff's mental limitations in November 2008.  She diagnosed mood disorder, non-specific, and personality disorder, cluster B.  She stated that plaintiff could remember and carry out short, simple instructions, and attend for 2 hour periods, and further opined that plaintiff should not work where frequent contact with the public was required, and that changes in work setting should be minimal.

Plaintiff's records were assessed by a non-medical single decision maker, who gave the opinion that plaintiff could perform work at all occupational levels subject to restrictions that plaintiff should avoid all exposure to hazards and could only frequently engage in all postural activities except that she should never climb ropes, ladders or scaffolds.

*Vocational Testimony*

A vocational expert was present at the hearing, and responded to four hypothetical questions from the ALJ and one from plaintiff's counsel.  The first hypothetical assumed the same physical limitations as set out in the report of the single decision maker, and the same mental limitations as set out in the report of the non-examining state psychologist. The ALJ asked the VE whether plaintiff could perform the two jobs she had previously held: fast food worker and security guard; the VE indicated that she could do so.

The second hypothetical assumed the same mental limitations, but a limitation to sedentary work.  The VE stated that such a person could not work either as a fast food worker or a security guard, but could perform other jobs available in the national

economy, including sedentary assembler, microfilm document preparer, and video surveillance monitor.

The ALJ's third hypothetical assumed the same limitations as in the second question, but added the need for a sit/stand option. The VE testified that the assembler position would not be appropriate for such an individual, but that she could work either as a microfilm preparer or surveillance monitor.

The fourth hypothetical involved the same limitations as in the third, but the individual would also require unscheduled breaks. The VE stated his opinion that there would be no jobs available.

Plaintiff's counsel then asked about a hypothetical person with the same age, education, background and work history as the plaintiff, who could not sustain concentration for two-hour periods due to medication side effects, and who would have to be absent two or more days per month due to seizures or pain, including headaches. The VE testified that such an individual could not work. In response to further questions from plaintiff's counsel, the VE indicated that each of those limitations would prove separately problematic, and that the limitation on concentration would preclude employment.

Discussion

Two competing duties are involved in the plaintiff's first assignment of error: the ALJ's duty to fully and fairly develop the record and the plaintiff's burden of proving that he or she is disabled.

> "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997). The regulations provide that the ALJ may order a consultative examination when warranted. 20 C.F.R. § 404.1517. Moreover, "[w]hen the evidence ... from your treating physician or psychologist or other medical source is inadequate ... to determine

>   whether you are disabled," the Commissioner is empowered to recontact the treating physician to obtain additional information. 20 C.F.R. § 404.1512(e). In addition, the regulations provide that the Commissioner will develop a claimant's medical history for at least 12 months preceding the month in which a disability application is filed. *See* Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003), citing 20 C.F.R. § 416.912(d). "Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." Ellison, 355 F.3d at 1276, *citing* 20 C.F.R. § 416.912(a).

Osborne v. Barnhart, 194 Fed.Appx. 654, 668 (11th Cir. 2006).

Plaintiff ties this argument to the lack of any medical evidence in the record concerning plaintiff's physical residual functional capacity ("RFC"). Plaintiff argues that the ALJ erred in making an RFC determination where no medical professional had given an RFC opinion, and asserts that the ALJ facing a case in which there is no such medical evidence is required to send the claimant on a consultative examination. That argument ignores plaintiff's burden.

In Carson v. Commissioner of Social Sec., 440 Fed.Appx. 863, 864 (11th Cir. Sept. 21, 2011), the ALJ's RFC determination that the claimant could "perform a limited range of light work" was upheld because "the ALJ fully discussed and evaluated the medical evidence, Mr. Carson's testimony, and the effect each impairment has on his daily activities." The Eleventh Circuit also held that:

>   While, the ALJ did not specifically refer to Mr. Carson's ability to walk or stand, the ALJ did limit Mr. Carson'' exertional level of work to "light work." "Light work" by definition limits the amount an individual can walk or stand for approximately six hours in an eight-hour work day. *See* SSR 83–10, 1983 WL 31251 (S.S.A.). Furthermore, the ALJ's thorough evaluation of Mr. Carson's case led the ALJ to adopt additional limitations to Mr. Carson's ability to perform light work. Simply because the ALJ chose not to adopt further limitations on Mr. Carson's ability to walk or stand, does not mean the ALJ did not properly consider the alleged limitations. Furthermore, there is substantial evidence that Mr. Carson is not fully disabled in regards to walking or standing because none of the

> doctors that evaluated Mr. Carson noted any concerns with his ability to stand or walk, other than what Mr. Carson complained of to them. On the contrary, Mr. Carson's treating physician, Dr. Lord, only put limitations on Mr. Carson's ability to use his left shoulder. Tr. at 13 Furthermore, Dr. Tran, who examined Mr. Carson for the Commissioner, noted that Mr. Carson's gait was normal and that he was able to enter and exit the examining table without difficult. Id. at 291. As such, the ALJ could properly decide that Mr. Carson could walk or stand for approximately six hours in an eight-hour work day.

391 Fed. Appx. at 864 (emphasis added). The Eleventh Circuit thus approved in Carson an RFC based upon the ALJ's "extensive review of the medical and non-medical evidence." (Id.). The ALJ in this case similarly determined plaintiff's RFC only after an extensive review of the medical and non-medical evidence in this record.

This Court and others within the Eleventh Circuit have also held that there is no requirement that the ALJ's finding be based on the residual functional capacity assessment of a treating or examining physician in every case. Thomas v. Astrue, 2012 WL 1145211, *7 (S.D. Ala. Apr. 5, 2012)("an ALJ's [residual functional capacity] assessment may be supported by substantial evidence even in the absence of an opinion by an examining medical source about a claimant's residual functional capacity"); Griffin v. Astrue, 2008 WL 4417228, *10 (S.D. Ala. Sept. 23, 2008)(rejected Plaintiff's argument that a physician's RFC assessment was required and held that plaintiff "has not demonstrated that the ALJ did not have enough information to enable him to make a RFC determination, nor has she pointed to any medical evidence which suggests that the ALJ's RFC assessment is incorrect."); Williams v. Astrue, 2009 WL 413541, *5 (M.D. Fla. Feb. 18, 2009)("[T[he [ALJ], as the factfinder, does not need an opinion from a treating or examining doctor concerning a claimant's functional limitation[s] in order to make a finding regarding a claimant's RFC."); Cooper v. Astrue, 2009 WL 537148, *7 (M.D. Ga.

Mar. 3, 2009)( "[A]n ALJ is not required to order additional consultative examinations if he does not find them necessary to make an informed decision" [and] "[t]his Court declines . . . to read into every case a requirement that the ALJ obtain a residual functional capacity assessment from a treating or examining physician.").

Courts outside the Eleventh Circuit have also rejected the argument that an ALJ's RFC determination must be supported by a specific medical opinion. In Chapo v. Astrue, 682 F.3d 1285, 1288-89 (10th Cir. 2012)("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question [and] [w]e have thus 'rejected [the] argument that there must be specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category'."), *quoting* Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). *See also* McDonald v. Astrue, 2012 WL 2989935, *10 (10th Cir. July 23, 2012)("[W]e reject McDonald's contention that an ALJ is not competent, in the absence of a medical opinion, to assess the severity of mental symptoms and determine the extent of the limitations that result based on the evidence in the claimant's medical records, her daily activities, and her positive response to medications [because] [t]hat is precisely the type of evidence an ALJ should consider in determining a claimant's RFC . . . based on all the evidence in the case record, both medical and non-medical."); Coldiron v. Commissioner of Social Sec., 391 Fed.Appx. 435, 439 (6th Cir. Aug. 12, 2010)(" An ALJ considers numerous factors in constructing a claimant's RFC, including the medical evidence, non-medical evidence, and the claimant's credibility."); Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001)(ALJ's RFC that claimant could perform sedentary work with a sit/ stand option was held to be

supported by both the medical and nonmedical evidence in the record, including claimant's own testimony, her "only intermittent" visits to the doctor, non-use of strong pain medication, and physician's observation that she had a "fairly good range of motion and muscle strength."); Martin v. Commissioner, Social Sec. Admin., 2012 WL 5511920, *2 (D. Md. Nov. 13, 2012)("An ALJ need not copy his RFC assessment from a specific medical opinion, but he is entitled to base his RFC finding on the entire record" which was properly done in this case, including consideration of "the claimant's testimony [], and the medical evidence from various treating sources before, during, and after the relevant time frame."). Plaintiff's first claim of error is thus without merit.

*Evaluating Impairments*

Plaintiff's next argument is that the ALJ erred in various ways in evaluating plaintiff's impairments. The court finds that one aspect of this challenge is valid and that remand is appropriate on that basis.[13]

Plaintiff testified concerning extreme drowsiness as a side effect of her anti-seizure medication and her blood pressure medication. As set forth in detail above, she stated that she generally slept most of each day. The ALJ found this testimony unconvincing (doc. 12 at 24) because plaintiff had not made any complaint about side

---

[13] The court thus does not address the remaining specific iterations of this challenge; the court further finds it unnecessary and inappropriate in this case to reach the merits of plaintiff's the third challenge—that the Appeals Council erred in relying on incomplete hypotheticals—as remand will likely moot complaints about a disability determination by the Appeals Council. On remand, the Commissioner should consider whether additional development is necessary to avoid potential challenges such as plaintiff has raised herein.
   In addition, it is not clear from the record whether plaintiff's blood pressure medication—which she testified also caused sleepiness—was unchanged during this period.

effects in two agency Disability Report forms[14], exhibits C2E and C9E (doc. 12, at 128 *et seq*. and 161 *et seq*.), completed August 28, 2008, and December 5, 2008, respectively.[15] However, those records both reflect that, at the time they were completed, plaintiff was taking Depakote for her seizures; thereafter, plaintiff's physician prescribed her Keppra.[16] Thus, the ALJ conclusion that plaintiff's failure to complain of side effects on the agency's forms indicated that she had no problem with drowsiness resulting from Depakote, the medication she was on at the time of those reports, the ALJ's analysis does not support a similar conclusion concerning possible side effects from the use of Keppra. Nor, in light of the significant improvement in plaintiff's seizures from the use of Keppra, may the ALJ assume that side effects of Keppra could be avoided by returning to her prior medication[17].

---

[14]  The lack of complaints of side effects to medical care providers can be used to discredit plaintiff's subjective complaints of such debilitating side effects. Byrd v. Astrue, 2012 WL 104522, *3 (M.D.Ala. Jan. 12, 2012). However, an erroneous finding that plaintiff had failed to mention such side effects at the hearing, where that finding is used to reject plaintiff's claim, has been held to require remand. McDevitt v. Comm'r of Soc. Sec., 241 Fed. Appx. 615, 2007 WL 2050910 (11th Cir.2007).

[15]  The court notes that, in the function report dated September 4, 2008, plaintiff informed the agency that she slept approximately half the day, doc. 12 at 147, and that she tends to fall asleep while cooking, id. at 149. The reasonableness of any conclusion drawn from the ALJ's assertion that plaintiff made no complaints in two other forms is thus undermined.

[16]  Somnolence is a recognized side effect of Keppra. *See* http://www.pdr.net/drugpages/concisemonograph.aspx?concise=1478.

[17]  Plaintiff testified at the hearing concerning the improvement made by Keppra in her seizures, reducing the frequency from two per week to one per week, and reducing the duration of each seizure. The ALJ stated that plaintiff reported seizures once weekly, lasting 15-20 minutes, doc. 12 at 25; her testimony concerning those figures involved the reduced symptoms from use of Keppra. The ALJ thus appears to have relied on the change of medication from Depakote to Keppra in finding such improvement; it is therefor clearly improper to rely on the changed medication on the one hand and ignore it when assessing side effects of medication.

Thus, this court finds that the ALJ's credibility determination concerning drowsiness as a side effect of plaintiff's medication is not supported by substantial evidence; this pretermits the question of whether the ALJ properly evaluated plaintiff's credibility on this point.[18]  Plaintiff's counsel included the inability to concentrate due to medication side effects as an element of the hypothetical posed to the VE, who opined that such a plaintiff could not work.[19]  The ALJ expressly made the ability to concentrate for two hour periods part of the RFC he assigned to plaintiff.  This error thus may have been have been critical to the outcome of the claim.  See Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995)("a lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.").  Regardless, to the extent that the ALJ made a credibility finding as to plaintiff's side effects, the basis for that finding is not supported by substantial evidence.

## Conclusion

For the reasons set forth above, it is hereby ORDERED that plaintiff's claim is REMANDED to the Commissioner for further proceedings consistent with this opinion.  A separate judgment shall issue.

DONE this the 25th day of March, 2013.

/s/  Katherine P. Nelson
UNITED STATES MAGISTRATE JUDGE

---

[18] This statement of the ALJ's credibility finding is clearer and more definitive than that made by the ALJ, who stated simply that the forms listed plaintiff's medications "but no medication side effects were noted (Exhibits 2CE and 29E)." Id. at 24.  It is questionable whether this half-sentence mention of purportedly contrary medical records would be a sufficient evaluation of plaintiff's credibility, if the factual basis had been correct.  See e.g., Hale v. Bowen, 831 F.2d 1007 (11th Cir. 1987)(ALJ must make findings on credibility).

[19]  In explaining his opinion, the VE focused on absenteeism and problems with concentration resulting from medication side effects.  Id. at 52-53.